UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

**NATIONWIDE ADVANTAGE MORTGAGE COMPANY,**

          Plaintiff,

v.                                        Case No. 13-cv-1420

**GSF MORTGAGE CORPORATION,**

          Defendant.
_____

## DECISION AND ORDER

Plaintiff Nationwide Advantage Mortgage Company ("NAMC") brings this suit alleging breach of contract, unjust enrichment, breach of fiduciary duty, and fraud claims against defendant GSF Mortgage Corporation. Before me now are the parties' cross-motions for summary judgment.

### I. Background

Defendant is a correspondent mortgage lender, or an originator lender, meaning that it screens potential borrowers and funds mortgage loans which are then resold to wholesale lenders on the secondary mortgage market. Plaintiff is one such wholesale lender, which purchases mortgage loans on the secondary mortgage market and profits by either collecting servicing fees or by reselling the loans. In October 2006, the parties entered into a correspondent lender purchase agreement (the "Agreement"), the sole purpose of which was to establish the framework by which defendant would sell loans to plaintiff and plaintiff would purchase loans from defendant. As a wholesale lender who regularly sold mortgage loans to the Federal National Mortgage Association ("Fannie Mae"), plaintiff had access to Fannie Mae's Desktop Underwriter Automated Underwriter

System (the "DO"), a web-based automated underwriting system developed that reports on the eligibility of a potential borrower using Fannie Mae's criteria. In order for defendant to access the DO, plaintiff acted as a "sponsoring lender" for defendant. This allowed defendant to obtain reports from the DO on the eligibility of potential borrowers. For each report that defendant obtained using plaintiff as the sponsoring lender, defendant was charged $15 and plaintiff was charged between $20 and $28.

On January 10, 2008, plaintiff gave written notice to defendant that it was terminating the Agreement. Defendant, however, continued to select plaintiff as its sponsoring lender in order to obtain reports from the DO, and plaintiff continued to be charged for those uses. In November 2011, Fannie Mae notified plaintiff of defendant's continued use of plaintiff's sponsorship, and plaintiff removed itself as a sponsoring lender for defendant on December 9, 2011. Plaintiff alleges that defendant breached the Agreement by continuing to name plaintiff as its sponsoring lender after termination of the Agreement. Plaintiff further contends that defendant's continued use of its sponsorship unjustly enriched defendant and constituted a breach of defendant's fiduciary duty and fraud. Defendant has moved for summary judgment on all claims. Plaintiff has moved for summary judgment on the breach of contract and unjust enrichment claims.

## II. Analysis

**A. Motion for leave to file**

After summary judgment briefing concluded, defendant filed a motion for leave to file. Defendant realized that it inadvertently failed to file the materials that support its statement of facts and seeks to file them after the fact. Additionally, defendant seeks leave

to file an amended statement of material facts and an amended response to plaintiff's statement of material facts to correct errors. Plaintiff does not object to the late filing of the supporting materials but does object to the amendment of the statement of facts, arguing that allowing amendment after the close of briefing would prejudice plaintiff because it was not able to respond to defendant's updated citations to the record. I will grant defendant's request to file its supporting materials. The argument as to whether to allow defendant to update citations in its statement of facts is immaterial because the proposed statements of fact are merely an aid for the court. I am not required to look solely at citations made in a parties' statement of facts and may consider all evidence in the record on summary judgment. *U.S. E.E.O.C. v. Target Corp.*, 460 F.3d 946, 956 (7th Cir. 2006). Thus, I will deny the request to file an amended statement of facts and amended response to plaintiff's statement of facts, but I will consider all evidence in the record, including defendant's belatedly filed materials, in determining whether summary judgment is appropriate.

**B. Summary judgment motions**

I may grant summary judgment where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56©. In determining whether summary judgment is appropriate, I consider all evidence submitted by the parties, and I draw all inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In cases like this, where the facts are largely undisputed, summary judgment is particularly appropriate. *Collins v. Am. Optometric Ass'n*, 693 F.2d 636, 639 (7th Cir. 1982).

1. Breach of contract claim

Plaintiff first claims that defendant's use of the DO system after termination of the Agreement constituted a breach of contract. The parties agree that in determining whether defendant breached the parties' contract, I must apply Iowa law because the contract contained a choice of law provision. Second Am. Compl. Ex. A at 13 (ECF No. 38-1) ("This Agreement will be governed by the laws of the State of Iowa.").

To succeed on its breach of contract claim, plaintiff must show: (1) the existence of a contract, (2) the terms and conditions of the contract, (3) that it has performed all the terms and conditions under the contract, (4) the defendant breached the contract, and (5) that plaintiff has suffered damages as a result of the breach. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). "A party breaches a contract when, without legal excuse, it fails to perform any promise which forms a whole or a part of the contract." *Id.* Contract interpretation is a question of law appropriately decided on summary judgment. *Id.* at 225. *See also Margeson v. Artis*, 776 N.W.2d 652, 659 (Iowa 2009) ("[T]he meaning of an unambiguous contract presents a legal question, which may be properly resolved by summary judgment."). In interpreting the words of a contract, I may consider extrinsic evidence of the parties intent, but "the words of an integrated agreement remain the most important evidence of intention." *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 727 (Iowa 2014) (internal quotations and citation omitted). I also keep in mind that a contract "includes not only what is expressly stated by its terms but also what is necessarily implied to give effect to its express terms." *Id.* I must "imply contractual terms where the obligation arises from the language used or is indispensable

to give effect to the intent of the parties." *Id.* (internal quotations and citation omitted).

Plaintiff argues that defendant's obligation to cease use of its DO sponsorship impliedly arose from certain provisions of the Agreement. Specifically, plaintiff argues that the Agreement's confidentiality paragraph, which requires defendant to cease use of all proprietary information within 5 days of termination of the Agreement, broadly defines "proprietary information" and includes use of its DO sponsorship. Plaintiff also argues that the Agreement's indemnification paragraph, which requires defendant to indemnify plaintiff "from any and all claims, losses, costs, and expense . . . which result from any action or omission of [defendant]," Second Am. Compl. Ex A. at 10 (ECF No. 38-1), obligates plaintiff to reimburse plaintiff for the costs it paid to Fannie Mae for defendant's use of its DO sponsorship after termination of the Agreement.

I conclude that defendant's use of the DO sponsorship was neither expressly nor implicitly covered by the Agreement. The Agreement "constitute[s] the complete and exclusive statement of the agreement" between the parties, *id.* at 12, and plaintiff concedes that it does not explicitly address defendant's use of its DO sponsorship. The language of the Agreement does not specifically refer to the DO system, plaintiff's sponsorship, or defendant's use of that sponsorship. Further, plaintiff admits that the parties did not negotiate defendant's use of the DO sponsorship until after the Agreement was executed. Pl.'s Statement of Facts at 3–4 (ECF No. 58). As the drafter of the Agreement, and given the fact that plaintiff had entered into countless similar agreements before and could have anticipated the subsequent negotiation of defendant's use of its sponsorship, plaintiff easily could have expressly included terms relating to DO sponsorship in the Agreement. *See Olney v. Hutt*, 105 N.W.2d 515, 520–21 (Iowa 1960) (stating that courts should "construe[]

5

most strongly" against the drafter of a contract).[1] Additionally, given that DO sponsorship was not negotiated until after the Agreement was executed, it would be inconsistent with the intent of the parties at the time the Agreement was made to conclude that use of plaintiff's DO sponsorship was covered by the Agreement, under either the confidentiality or indemnification provisions, and it would be unfair to hold defendant responsible for a breach that it could not reasonably have foreseen when it signed the Agreement. *See Olney v. Hutt*, 105 N.W.2d 515, 520 (Iowa 1960) ("[The courts] have no right to extend the terms of the contract beyond the reasonable contemplation of the parties at the time it was made."); *see also Meyer v. Nottger*, 241 N.W.2d 911, 920 (Iowa 1976) ("[D]amages resulting from breach of contract are recoverable only for those injuries which may reasonably be considered as arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of the parties, at the time of contracting, as the probable result of the breach.").

Nor is the use of the DO an implied obligation that arises from the language of the contract or indispensable to give effect to the intent of the parties. *See Alta Vista Props., LLC*, 855 N.W.2d at 727. Defendant did not need plaintiff's sponsorship to obtain reports from the DO because it had other sponsoring lenders during the relevant period. Additionally, defendant did not need to obtain reports at all from Fannie Mae in order to extend mortgage loans; the reports simply provided defendant with information about whether a potential borrower would meet Fannie Mae's criteria. Thus, it was not implied

---

[1] Perhaps use of the DO was the subject of some subsequent oral agreement between the parties, but plaintiff does not raise any claim based on a subsequent oral agreement.

6

that in order to comply with the Agreement, defendant would require access to the DO or require plaintiff's sponsorship to access the DO.

Plaintiff's breach of contract argument claim also fails because plaintiff's "sponsorship" does not constitute "proprietary information" under the contractual definition. The Agreement defines proprietary information as including, but not limited to:

> (I) information and materials relating to the Participant Guidelines, NAMC underwriting processes and guidelines, Mortgage Loan files originated, Borrower information, information relating to product development strategy and activity, marketing strategy, corporate strategic plans, pricing and financial information, systems, processes, procedures, or practices, (ii) confidential, proprietary or trade secret information orally disclosed and identified as such on the date of its first disclosure, (iii) confidential, proprietary or trade secret information disclosed and clearly and conspicuously identified in writing as such at the time of its first disclosure or which a reasonable person would recognize as such, and (iv) any compilation or summary of information or data that contains or is based on Proprietary Information.

Second Am. Compl. Ex. A at 7 (ECF No. 38-1). The definition specifically refers to "information or materials," "files," and "compilation[s] or summar[ies] of information or data," and plaintiff's "sponsorship" is not information, data, or materials. Even if plaintiff's sponsorship constitutes "information," it is difficult to conceive of how the selection of plaintiff's name from a list of sponsoring lenders constituted the use of plaintiff's proprietary information. Plaintiff argues that defendant's use of the sponsorship constituted use of information "relating to . . . NAMC underwriting processes and guidelines," but the sponsorship and sponsorship number provided defendant with access to *Fannie Mae'*s underwriting system and eligibility criteria, not NAMC's.

Although the Agreement's definition of proprietary information is broad and not limited to the listed examples, I must still interpret it consistent with the intention of the parties at the time the contract was made. *See Olney v. Hutt*, 105 N.W.2d 515, 520 (Iowa

7

1960). Plaintiff's interpretation that the definition of proprietary information includes something not listed in the Agreement and not even negotiated until after execution of the Agreement would not achieve this result.

Similarly, plaintiff asks me to interpret the broad language of the indemnification provision, which requires defendant to "indemnif[y] . . . , defend, and hold harmless" plaintiff "from any and all claims, losses, costs, and expenses . . . which result from any action or omission of [defendant]," Second Am. Compl. Ex A. at 10 (ECF No. 38-1), as a contractual obligation to reimburse plaintiff for its costs arising from defendant's use of the DO sponsorship. But I have concluded that defendant's use of the sponsorship was not otherwise covered by the Agreement. To conclude that this language, though broad, requires defendant to indemnify plaintiff for behavior that was not governed by the scope of the Agreement would lead to an absurd result. This conclusion is supported by the language of the Agreement, which lists examples of conduct the parties contemplated as being covered by the indemnification provision, all of which relate to defendant's conduct related to the scope of the Agreement. *See id.* (including examples of conduct arising out of the origination of loans in violation of the law, a breach of the Agreement, failure to maintain licensing, and fraud in the origination of loans).

For these reasons, I conclude that the express language of the Agreement unambiguously does not address defendant's use of plaintiff's DO sponsorship and that such an obligation cannot be implied from its terms. Thus, plaintiff cannot maintain a breach of contract claim and I find for defendant.

2. Unjust enrichment claim

Plaintiff's unjust enrichment claim is an alternative theory of liability to its breach of

contract claim; if use of its DO sponsorship was not covered under the terms of the Agreement, then plaintiff argues that defendant's continued use of the sponsorship after the Agreement's termination unjustly enriched defendant. The parties disagree as to which state's substantive law applies to the unjust enrichment claim. Plaintiff argues that Iowa law applies because even if the Agreement did not specifically address use of the DO, it did govern the parties' business relationship and thus the contract's choice-of-law provision designating Iowa law should still apply. Defendant argues that an unjust enrichment claim is separate and distinct from a breach of contract claim and that the law of this forum, Wisconsin, applies to the unjust enrichment claim. When determining which state's law applies, I look to the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).

Under Wisconsin law, where the choice of law analysis is not outcome determinative, I need not engage in a choice of law analysis and the law of the forum state applies. *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 495–96 (Ct. App. 1998). I conclude that Wisconsin and Iowa's claims for unjust enrichment are substantially similar and the application of one over the other will not affect the outcome of the claim. *Compare Beer Capitol Distrib., Inc. v. Guinness Bass Imp. Co.*, 290 F.3d 877, 881 (7th Cir. 2002) (defining the elements of an unjust enrichment claim under Wisconsin law), *with Iowa Dep't of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154–55 (Iowa 2001) (defining the elements of an unjust enrichment claim under Iowa law). Further, even if the choice of law mattered, Wisconsin law would be more appropriate where I have already determined that the complained of conduct was not governed by the terms of the

Agreement; it follows that the Agreement's choice of law provision does not govern plaintiff's non-contractual claims. *See Palmer*, 637 N.W.2d at 154 ("The doctrine of unjust enrichment . . . is equitable in nature, not contractual."). Thus, I will apply Wisconsin law.

Under Wisconsin law, an unjust enrichment claim consists of the following elements: (1) a benefit conferred on defendant, (2) defendant's knowledge of and appreciation of that benefit, and (3) inequity that results from defendant's retention of that benefit. *Beer Capitol Distributing, Inc.*, 290 F.3d at 81. Here, defendant appears to have received some benefit from using plaintiff's sponsorship. Plaintiff's sponsorship allowed defendant access to the DO system and to the reports it generated, which it would not have been able to access without a sponsor. And it is clear that this benefit was at some expense to the plaintiff because it was charged a fee for each of the reports defendant obtained. Thus, defendant received reports at a discounted rate, only paying $15 per report, while plaintiff was also charged for a portion of the reports, between $20 and $28 per report.[2]

Next, I consider whether it would be inequitable to allow defendant to retain the benefit without compensating plaintiff for its costs. Plaintiff argues that it would be inequitable because while the Agreement was in effect, it had the opportunity to recoup its sponsorship costs through the purchase of mortgage loans from defendant. However, after it terminated the Agreement with defendant, it no longer had any way of recouping the

---

[2] I note that there is a dispute as to whether defendant actually received a financial benefit from use of plaintiff's sponsorship. Defendant had other sponsoring lenders it could have selected in the DO system when generating reports, and it therefore only ever would have paid $15 per report. Thus, arguably defendant's other sponsoring lenders received the financial benefit because they were purchasing loans from defendant without having to pay the sponsoring lender fee for the reports. This issue, however, is immaterial because plaintiff's unjust enrichment claim fails for other reasons.

10

costs of sponsoring defendant's use of the DO, and thus it would be inequitable not to require defendant to reimburse it for those costs. Defendant argues it would inequitable to require it to reimburse plaintiff now because it did not know that plaintiff was being charged for each report and because plaintiff had the ability to discover this problem much sooner than it did but failed to.

    I agree with defendant that in balancing the equities, it would not be equitable to require defendant to reimburse plaintiff. The defendant's appreciation or knowledge that it was receiving a benefit is relevant to this analysis, *id.*; *see also Credit Bureau Enters., Inc. v. Pelo*, 608 N.W.2d 20, 25 (Iowa 2000) (noting that unjust enrichment occurs "where a person performs services for another which are known to and accepted by the latter"), and the record indicates that defendant did not know at the time that Fannie Mae charged the sponsoring lender a fee each time defendant used its sponsorship. Defendant's managing vice president at the time testified that the company did not know sponsoring lenders were charged a fee and that defendant thought the $15 it paid for a report was the full cost of a report. Jampedro Dep. Tr. at 60 (ECF No. 66-3). Defendant had several other sponsoring lenders at the time, and no matter which sponsor it selected, it only ever paid $15 per report, supporting defendant's assertion. Further, there is no evidence that plaintiff ever informed defendant about the sponsoring lender fee, and plaintiff admits that defendant never saw copies of Fannie's Mae's pricing schedule for sponsoring lenders or the invoices Fannie Mae sent to plaintiff. Conway Dep. Tr. at 80 (ECF No. 66-2). Plaintiff puts forward no evidence to contradict defendant's assertion that it had no knowledge of the fee aside from stating that, generally, "people in the business [know] how the relationship worked." *Id.* at 80–81 (admitting to having no knowledge that GSF specifically

11

was aware that plaintiff was being charged). This is not enough to survive summary judgment. *See Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (stating that arguments at summary judgment must be based on more than "speculations, hunches, intuition, or rumors"). Based on this uncontroverted evidence, I conclude that defendant had no knowledge or appreciation that it was receiving the benefit of discounted reports.

The evidence also indicates that plaintiff was receiving monthly invoices from Fannie Mae which included an itemized list of defendant's and other corresponding lenders' charges. Defendant's charges were identified on the invoice by a unique identifying number assigned by Fannie Mae, and one of plaintiff's employees, who was responsible for spot-checking these invoices, approved them for payment. Plaintiff continued to approve defendant's charges and pay Fannie Mae for them for approximately four years, never realizing that defendant was still using their sponsorship, contacting defendant about its continued use, nor taking steps to remove defendant as a sponsored lender in the DO system. In those four years, plaintiff never conducted a more extensive audit of DO use for which it was being charged, and it was not until Fannie Mae notified plaintiff in November 2011 of defendant's continued use of the sponsorship that plaintiff began to investigate.[3] Plaintiff's own vice president of quality and risk management admitted that periodic audits of DO fees might have been a good idea. Conway Dep. Tr. at 91 (ECF No. 66-2) ("Shame

---

[3] Plaintiff claims that it never before had the need to conduct an audit because no other corresponding lender had continued to use its sponsorship after termination of their business agreements, but this argument fails. If plaintiff had never before conducted an audit, it would have had no way to discover whether other lenders continued using its sponsorship after contract termination. When plaintiff did conduct the audit after November 2011, it discovered two other lenders who were in fact using its sponsorship after contract termination, further undermining its argument. Conway Dep. Tr. at 61–62, 91–92 (ECF No. 66-2).

12

on us for not doing that."). Defendant's lack of awareness coupled with plaintiff's failure to timely identify defendant's continued DO use weigh against a finding for plaintiff on its unjust enrichment claim. It would be unfair to require defendant to reimburse plaintiff for fees it did not know plaintiff was incurring and which plaintiff allowed to accumulate for four years by inadequately monitoring the fees Fannie Mae was charging it. Thus, I find for defendant on the unjust enrichment claim as well.

3. Breach of fiduciary duty claim

Plaintiff also claims that defendant's use of the DO sponsorship constituted a breach of defendant's fiduciary duty to plaintiff. The parties dispute whether Iowa or Wisconsin law applies. The main dispute here is whether a fiduciary relationship existed between the parties, and the existence of a fiduciary relationship is a necessary element of a breach of fiduciary duty claim under both Wisconsin and Iowa law. *Compare Berner Cheese Corp. v. Krug*, 312 Wis. 2d 251, 270 (2008), *with Vos v. Farm Bureau Life Ins. Co.*, 667 N.W.2d 36, 51–52 (Iowa 2003). Further, both states similarly define a fiduciary relationship. *Compare Merrill Lynch, Pierce, Fenner & Smith v. Boeck*, 127 Wis. 2d 127, 136 (1985) ("A fiduciary relationship arises from a formal commitment to act for the benefit of another."), *with Vos*, 667 N.W.2d at 52 ("A fiduciary relationship exists between two persons when one of then is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation."). Therefore I will apply Wisconsin law because the choice of law is not outcome determinative.[4]

---

[4] Defendant also argues that plaintiff's breach of fiduciary duty claim is barred by Wisconsin's 2-year state of limitations for intentional torts. *See Zastrow v. Journal Commc'ns, Inc.*, 291 Wis. 2d 426 (2006). However, defendant failed to put plaintiff on notice of its statute of limitations defense by raising it as an affirmative defense or

13

Fiduciary relationships can either be specifically created by contract or implied in law due to the factual situation surrounding the parties' relationship. *Prod. Credit Ass'n of Lancaster v. Croft*, 143 Wis. 2d 746, 752 (Ct. App. 1988). Here, plaintiff must rely on a fiduciary duty implied in law because the Agreement specifically designates the parties as independent contractors. Second Am. Compl. Ex. A at 11 (ECF No. 38-1) ("As an independent contractor, [defendant] has the right to exercise independent judgment as to the time, place, and manner of performing the terms of this Agreement. . . . [Defendant] shall have no authority to bind [plaintiff] in any manner whatsoever."). Thus, plaintiff must point to facts which establish a fiduciary relationship. "A fiduciary relationship arises from a formal commitment to act for the benefit of another or from special circumstances from which the law will assume an obligation to act for another's benefit." *Prod. Credit Ass'n of Lancaster*, 143 Wis. 2d at 755. Indicia of a fiduciary relationship include inequality of the parties, dependence of one party on another, weakness of business intelligence or knowledge of the facts involved, or other conditions giving one party an advantage over the other. *Id.* at 756; *see also Vos*, 667 N.W.2d at 52 (listing similar indicia).

Plaintiff argues that defendant's use of the sponsorship created an agency relationship whereby defendant, as plaintiff's agent, had a duty to use the sponsorship for plaintiff's benefit. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or

---

raising it in a motion under Rule 12, thus waiving it. Fed. R. Civ. P. 8(c); 12(h). *See also* Def.'s Am. Answer at 17–19 (ECF No. 42) (only invoking a statute of limitations defense based on the 3-year limitations period set forth in the Agreement).

14

otherwise consents so to act." Restatement (Third) of Agency § 1:01. An agent has a fiduciary duty to act loyally in the principal's interests and on the principal's behalf in all matters connected with the agency relationship. Restatement (Third) of Agency § 8.01.

While plaintiff asserts that an agency relationship existed between the parties it fails to provide any evidence to support this assertion. Plaintiff argues that by accepting its sponsorship, defendant assented to the agency relationship. However, it points to no facts which tend to prove defendant assented to act on behalf of plaintiff when using its sponsorship. *See* Restatement (Third) of Agency § 1:03 ("A person manifests assent or intention through written or spoken words or other conduct.").

Also problematic is the fact that plaintiff does not appear to have exercised control or decision-making authority over defendant's use of its sponsorship. Even while the Agreement was still in effect, plaintiff admits that defendant could have used plaintiff's sponsorship to originate loans and never offered a single one of them to plaintiff for purchase. Conway Dep. Tr. at 92–94 (ECF No. 66-2). Thus, there was no guarantee that plaintiff would ever benefit from defendant's use of the sponsorship, and plaintiff seemed to have little control over how and when defendant used the sponsorship. Rather, the record indicates that plaintiff merely provided defendant with a tool to aid it in the origination of loans, some of which may or may not have been offered for plaintiff to purchase under the framework of the Agreement. Plaintiff shows no evidence that it, for example, instructed defendant on what it should and should not do with respect to use of it sponsorship, gave defendant interim instructions regarding its use of the sponsorship, or exercised any influence over defendant's use of the sponsorship. *See* Restatement (Third) of Agency § 1.01 cmt. f. The only control plaintiff appears to have had over

15

defendant's use of the sponsorship was the ability to remove defendant as a sponsored lender and thus prevent it from using the sponsorship altogether. However, this is not enough to establish that plaintiff "ha[d] the right throughout the duration of the relationship to control the agent's acts." *id.* § 1.01 cmts. c, f (stating that "[t]he power to give interim instructions distinguishes principals in agency relationships from those who contract [with those] who are not agents"). Although the existence of a fiduciary relationship is a fact question, where there are no facts supporting the existence of an agency relationship giving rise to a fiduciary duty, as here, summary judgment is appropriate. Fed. R. Civ. P. 56©; *Collins v. Am. Optometric Ass'n*, 693 F.2d 636, 639 (7th Cir. 1982). Therefore, I will grant summary judgment in favor of defendant.

4. Fraud claim

Finally, plaintiff argues that defendant's continued use of the DO system constituted fraud. Again, there is a dispute as to whether Wisconsin or Iowa law applies, and again, I will apply Wisconsin law because the choice of law is not outcome determinative. *Compare Kaloti Enters., Inc. v. Kellogg Sales Co.*, 283 Wis. 2d 555, 570 (2005) (defining the elements of a common-law fraud claim under Wisconsin law), *with Dier v. Peters*, 815 N.W.2d 1, 7 (Iowa 2012) (defining the elements of common-law fraud in Iowa).

To prove fraud, plaintiff must show: "(1) the defendant made a factual misrepresentation; (2) which was untrue; (3) the defendant either made the representation knowing it was untrue or made it recklessly without caring whether it was true or false; (4) the defendant made the representation with intent to defraud or to induce another to act upon it; and (5) the plaintiff believed the statement to be true and relied on it to his/her detriment." *Kaloti Enters., Inc.*, 283 Wis. 2d at 570. Plaintiff's theory of fraud is as follows:

16

Fannie Mae acted as plaintiff's agent, each time defendant listed plaintiff as a sponsoring lender after termination of the Agreement it made a misrepresentation to Fannie Mae, defendant knew that plaintiff was no longer defendant's sponsor, defendant intended to deceive Fannie Mae, and that this misrepresentation caused plaintiff's damages. Implicit in this argument is that a misrepresentation to Fannie Mae, as plaintiff's alleged agent, constituted a misrepresentation to plaintiff.

Defendant argues that plaintiff has no evidence of any agency relationship between itself and Fannie Mae, specifically no evidence that plaintiff controlled Fannie Mae, that Fannie Mae consented to such control, or that Fannie Mae was performing work on behalf of plaintiff. I agree. In order to prove its fraud claim, plaintiff must prove that Fannie Mae acted as its agent. Otherwise, the alleged misrepresentations were made to Fannie Mae, not plaintiff, and any potential fraud claim would be lie with Fannie Mae. *See id.* at 569 (requiring that *plaintiff* believe the misrepresentation); *Spacesaver Corp. v. Marvel Grp., Inc.* 621 F. Supp. 2d 659, 663 (W.D. Wis. 2009) (noting that under common law fraud, a misrepresentation made to a third party and not plaintiff "undoubtedly" fails).

Rather than putting forward evidence that Fannie Mae was acting as plaintiff's agent, plaintiff argues that defendant has the burden to prove the absence of fraud. I disagree. Plaintiff bears the burden of putting forth evidence to support each element of its claim. *Lundin v. Shimanski*, 124 Wis. 2d 175, 184 (1985) ("The party alleging fraud has the burden of proving the elements."). Where defendant has challenged the sufficiency of plaintiff's evidence at summary judgment, plaintiff must put forward at least some facts to support its allegations. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Once a party has made a properly-supported motion for summary judgment, the nonmoving party

17

may not simply rest upon the pleadings but must instead submit evidentiary materials that set for specific facts showing that there is a genuine issue for trial."); *Johnson v. Cambridge Industries, Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."). Without any evidence of an agency relationship between plaintiff and Fannie Mae, no reasonable jury could conclude that defendant made misrepresentations to *plaintiff*.

Even if I were to assume an agency relationship existed between Fannie Mae and plaintiff, plaintiff puts forward no evidence that defendant's intent in lying to Fannie Mae was to defraud plaintiff of the sponsoring lender fees. While state of mind is generally a fact question not amenable to resolution on summary judgment, here all the facts indicate, as discussed above, that defendant was not aware that plaintiff was being charged a separate fee, and plaintiff has put forward no evidence to support the conclusion that it was aware aside from the assertion that generally "people in the business know." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (stating that when "all plaintiff[] has to go on is a . . . hunch about the defendant's motives," a claim cannot survive summary judgment). Without any evidence to support that defendant knew plaintiff was being charged for its use of the sponsorship, plaintiff cannot prove that defendant intended to defraud plaintiff of these charges–defendant cannot have intended something about which it had no knowledge. For these reasons, I will also grant summary judgment in favor of defendant on the fraud claim.

18

Case 2:13-cv-01420-LA   Filed 09/25/15   Page 18 of 19   Document 68

## III. Conclusion

**THEREFORE, IT IS ORDERED** that defendant's motion for summary judgment (ECF No. 52) is **GRANTED**. The Clerk shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that plaintiff's motion for partial summary judgment (ECF No. 55) is **DENIED**.

**IT IS FURTHER ORDERED** that defendant's motion for leave to file (ECF No. 66) is **GRANTED in part** and **DENIED in part**.

Dated at Milwaukee, Wisconsin, this 25th day of September, 2015.

s/ Lynn Adelman
_____
LYNN ADELMAN
District Judge